UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ONE OWNERSHIP INTEREST IN THE ) | |
| CLEVELAND INTERNATIONAL FUND - ) | |
| MEDICAL MART HOTEL, LTD HELD IN ) | |
| THE NAME OF WANG WEI, A/K/A JACK ) | |
| WANG SET TO MATURE IN 2020 AND ) | |
| PAY OUT $500,000.00, ) | |
| ) | Civil Action No. _____ |
| $141,086.00 WIRED TO REEKAY ) | |
| TECHNOLOGY, HELD IN A BLOCKED ) | |
| FUNDS ACCOUNT, ) | |
| ) | |
| Defendants In Rem, and ) | |
| ) | |
| WANG WEI, A/K/A JACK WANG, ) | |
| 4-4-2301 XINYI JIAYUAN ) | |
| CHONGWENMEN, DONGCHENG ) | |
| BEIJING, CHINA ) | |
| ) | |
| Defendant. ) | |
| ) | |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM* AND CIVIL PENALTIES

COMES NOW, Plaintiff the United States of America, by and through the United States

Attorney for the District of Columbia, and brings this verified complaint for (i) forfeiture in a civil

action *in rem* against the defendant properties, namely: one ownership interest in the Cleveland

International Fund - Medical Mart Hotel, Ltd held in the name of Wang Wei, a/k/a Jack Wang set

to mature in 2020 and pay out $500,000.00 ( "Defendant Property 1") and $141,086.00 wired to

Reekay Technology ( "Defendant Property 2") (collectively the "Defendant Properties"), which

are in the control of the U.S. government; and (ii) civil claims brought *in personam* against Jack Wang (the "Defendant") and alleges as follows:

## NATURE OF ACTION AND THE DEFENDANT IN REM

1.      This *in rem* forfeiture action arises out of an investigation by the Federal Bureau of Investigation ("FBI"), the Department of Homeland Security, and the Department of Commerce, of a scheme by Jack Wang and co-conspirators, known and unknown, to obtain U.S. origin items, through the use of false shipper export declarations ("SED") to end users in the Islamic Republic of Iran ("Iran") in violation of the Export Administration Regulations, as authorized by the Export Administration Act of 1979; the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq*; and the federal money laundering statutes, codified at 18 U.S.C. §§ 1956(a)(2)(A), (h).

2.      The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as property constituting or derived from proceeds traceable to violations of IEEPA. In addition, the Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in, and traceable to money laundering violations, in violation of 18 U.S.C. §§ 1956(a)(2)(A), (h).

3.      Defendant is subject to a money laundering monetary penalty pursuant to 18 U.S.C. § 1956(b).

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

5.      Venue is proper in this District over the United States' forfeiture claims pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts and omissions giving rise to the forfeiture took place in the District of Columbia.  Venue is proper in this District over the United States' *in personam* claim pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions

giving rise to such claim occurred in this District.  The coconspirators, including Defendant, failed to seek licenses from the Office of Foreign Assets Control ("OFAC"), which is located in Washington, D.C., for conducting transactions with these funds in violation of United States law.

## STATUTORY FRAMEWORK

### I.  THE EXPORT ADMINISTRATION REGULATIONS

6.  The United States Department of Commerce, which is located in Washington, D.C., has the authority to prohibit or curtail the export of goods and technologies from the United States to foreign countries in order to protect, among other things, the national security and foreign policy of the United States. The Department of Commerce implemented that authority through the Export Administration Regulations ("EAR") (see below), which restrict the export of certain goods and technologies unless authorized by the Department of Commerce through issuance of a valid export license by its Bureau of Industry and Security.  The EAR further prohibit any transaction designed to evade or avoid, or which has the purpose of evading or avoiding, said regulations, including the making of false or misleading statements or concealing a material fact in the course of the submission of documents relating to an export of goods or technologies.

7.  The EAR place requirements on exporters and include a list of products, commodities, and items for which an export license is required.  *See* 15 C.F.R. § 744.

8.  Whether an item requires an export license depends in part on what country the item is being exported to, who the end-user of the item is, and what the end-user intends to use the item for.  The EAR expressly requires a license applicant to disclose the names and addresses of all parties to a transaction, including the applicant, purchaser, intermediate consignee(s) (if any), ultimate consignee, and end-user. *See* 15 C.F.R. §§ 748.4(b), 748.5.  Certain applications must be supported by documents designed to elicit information concerning the disposition of the items intended for export.  *See* 15 C.F.R. § 748.9(b).

9.      The EAR's authorizing statute, the Export Administration Act of 1979 ("EAA"), codified at 50 U.S.C. App. 2401-2420, expired in August 1994, and was reauthorized by Public Law 106-508, signed on November 13, 2000. The EAA lapsed again on August 20, 2001, but the Regulations have continued in full force and effect through periodic reauthorizations and successive invocations of IEEPA (see below). On August 17, 2001, President George W. Bush issued Executive Order ("E.O.") 13222, in which he ordered that all provisions of the EAR "remain in full force and effect" under the IEEPA authority. E.O. 13222 has been extended by successive Presidential Notices.

10.      To violate, attempt to violate, or conspire to violate any portion of the EAR is a felony punishable by up to 20 years imprisonment under IEEPA. *See* 50 U.S.C. § 1705. The EAR makes it unlawful to engage in any conduct prohibited by, or contrary to, or to refrain from engaging in any conduct required by, the EAR. It is also unlawful to violate any order, license or authorization issued thereunder, and equally unlawful to cause, aid, abet, solicit, attempt, or conspire to commit a violation of the EAR, or any order, license, or authorization issued thereunder. The EAR prohibit the ordering, buying, removing, concealing, storing, use, sale, loan, disposition, transfer, transport, financing, forwarding, or other servicing, in whole or in part, of any item exported or to be exported from the United States, that is subject to the EAR, with knowledge that a violation of the EAR, or any order, license, or authorization issued thereunder, has occurred. *See* 15 C.F.R. § 764.2(a)-(e).

11.      Finally, pursuant to the EAR, it is unlawful to engage in any transaction or take any other action with intent to evade the provisions of the EAR, or any order, license, or authorization issued thereunder. *See* 15 C.F.R. § 764.2(h).

## II.   THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT AND IRANIAN SANCTIONS

12.     This investigation relates to violations of the Regulations and Executive Orders issued pursuant to IEEPA, codified at 50 U.S.C. § 1701 *et seq.* IEEPA gives the President certain powers, defined in section 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations thereunder. *See* 50 U.S.C. § 1705(a). A conspiracy to violate IEEPA is prohibited by 18 U.S.C. § 371.

*Iranian Transactions and Sanctions Regulations*

13.     On March 15, 1995, the President issued E.O. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." E.O. 12957 was expanded and continued by E.O.'s 12959 and 13059, and was in effect at all times relevant to this complaint. These E.O.'s imposed economic sanctions, including a trade embargo, on Iran and prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. They also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders. In October 2012, the ITR was renamed, and without substantive changes, republished as the Iranian Transactions and Sanctions Regulations or "ITSR."

14.     The ITSR prohibited, among other things, the export, re-export, sale, or supply, directly or indirectly, of any goods, technology, or services from the United States or by a United

States person, wherever located, to Iran or the Government of Iran, without prior authorization or license from the United States Department of the Treasury, through the Office of Foreign Assets Control ("OFAC"). These regulations further prohibited any transactions that evade or avoid or have the purpose of evading or avoiding any of the prohibitions contained in the ITSR, including the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Iran. *See* 15 CFR §§ 560.201, 560.203, 560.204, 560.205, and 560.206.

15.   Criminal violations of the ITSR are enumerated by the criminal penalty statutes of IEEPA, 50 U.S.C. §§ 1701-1705. The E.O.'s and the ITSR were in effect at all times relevant to this warrant.

## III.   13 U.S.C. § 305(a)

16.   At all times material to the FBI investigation at issue, 13 U.S.C. § 305(a) provided, in pertinent part:

> a.   Failure to file; submission of false or misleading information – Any person who knowingly fails to file or knowingly submits false or misleading export information through the Shippers Export Declaration (SED) (or any successor document) or the Automated Export System (AES) shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both.
>
> b.   Furtherance of illegal activities – Any person who knowingly reports any information on or uses the SED or the AES to further any illegal activity shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both.

17.   Pursuant to United States law and regulation, exporters and shippers or freight forwarders are required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those filings are completed through the submission

of a paper SED or the submission of Electronic Export Information ("EEI") via the AES. AES is administered by the United States Department of Homeland Security, Customs and Border Protection ("CBP"), which is headquartered in Washington, D.C.

18.     The SEDs and EEIs are official documents submitted to the Department of Homeland Security in connection with exports from the United States. Exporters, shippers, and freight forwarders are required to file an SED or EEI for every export of goods or technology from the United States with a value of $2,500 or more. An SED or EEI is also required regardless of the value of the goods or technology if the goods or technology require an export license.

19.     An essential and material part of the SED or EEI is information concerning the ultimate consignee (commonly known as "end-user") and the country of ultimate destination of the export (commonly known as "end-use"). In many cases, the identity of the ultimate consignee determines whether the goods may be exported: (a) without any specific authorization from the United States Government; (b) with the specific authorization or a license from the United States Department of Commerce, the United States Department of State, or the United States Department of the Treasury; or (c) whether the goods may not be exported from the United States.

20.     EEI, SED, and forms filed through AES are used by the United States Departments of State, Commerce, and Treasury for export control purposes. Other U.S. Government agencies also rely upon information provided by AES records.

21.     The SED or EEI is equivalent to a statement to the United States Government that the transaction occurred as described. As such, 13 U.S.C. § 305 criminalizes the knowing submission of false or misleading export information through a SED or EEI.

**IV.     18 U.S.C. § 554(a)**

22.     At all times material to this investigation, 18 U.S.C. § 554(a) criminalized fraudulently or knowingly exporting or sending from the United States, or attempting to export or

send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or the concealing, buying, or in any manner facilitating the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States. Either a violation of IEEPA or 13 U.S.C. § 305 would serve as the predicate "contrary to any law or regulation" as required by 18 U.S.C. § 554(a).

## V.    18 U.S.C. § 371

23.    At all times material to the FBI investigation at issue, 18 U.S.C. § 371, provided, in pertinent part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

## VI.    MONEY LAUNDERING

24.    18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

25.    18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes, among other things, transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

26.    Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," also includes a violation of the EAA, IEEPA, and 18 U.S.C. § 554(a).

## VII.   FORFEITURE

27.   Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of IEEPA is subject to forfeiture.

28.   Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to civil forfeiture.

## VIII.   MONETARY PENALTY

29.   Pursuant to 18 U.S.C. § 1956(b), whoever conducts or attempts to conduct a transaction described in § 1956(a)(1) or (a)(3), or a transportation, transmission, or transfer described in § 1956(a)(2), is liable to the United States for a civil penalty of not more than the greater of the value of the property, funds, or monetary instruments involved in the transaction or $10,000.

## FACTS GIVING RISE TO FORFEITURE

## I.   BACKGROUND

30.   An investigation of an Iranian procurement network revealed that Jack Wang was the Beijing-based owner of several Iranian procurement front companies. At Wang's direction, the front companies, located in mainland China and Hong Kong, purchased U.S. origin technology on behalf of Iranian end users without the licenses required by the U.S. government. Wang's companies include 32 Group China Ltd, Caprice Group Ltd, Reekay Technology, Sky Rise Technology Ltd, and TiMi Technologies Co Ltd.

### A.   Sanctions on Wang and His Customers

31.   The Department of Commerce maintains a list of names of certain foreign persons – including businesses, research institutions, government and private organizations, individuals, and other types of legal persons – that are subject to specific license requirements for the export,

re-export and/or transfer (in-country) of specified items. These persons comprise the Entity List. Persons and companies on the Entity List are subject to licensing requirements and policies supplemental to those found elsewhere in the EAR. Persons and companies on the Entity List present a greater risk of diversion to weapons of mass destruction programs, terrorism, or other activities contrary to U.S. national security or foreign policy interests. The Entity List serves as an important tool to prevent unauthorized trade in items subject to the EAR.

32.     On November 12, 2015, the Department of Commerce determined that there was reasonable cause to believe, based on specific and articulable facts, that Wang, as well as his affiliated front companies, Sky Rise Technology Ltd, TiMi Technologies Co Ltd, 32 Group China Ltd., Caprice Group Ltd, and Reekay Technology, supplied U.S.-origin items to an Iranian party associated with the Iranian defense industry and to an Iranian party whose customers include companies designated by the Department of Treasury as Specially Designated Nationals. Based on this finding, the Department of Commerce added Wang, as well as his affiliated front companies, to the Entity List.

33.     The Department of State administers similar sanctions programs. One of the State Department's active sanctions programs is the Iran, North Korea, and Syria Nonproliferation Act sanctions ("INKSNA"), which authorizes the United States to impose sanctions against foreign individuals, private entities, and governments that engage in proliferation activities.

34.     On March 21, 2017, the Department of State imposed sanctions, pursuant to INKSNA, against Wang and "Sky Rise Technology (a/k/a Reekay Technology Limited)" for transfers to Iran's missile program.

B. **Wang's Ties to Sanctioned Iranian Entities**

35.    A confidential reliable source ("CS-1") revealed that Wang had been in communication with a senior employee of Fanavari Moj Khavar ("Fana Moj"), a Tehran, Iran-based company.  On October 13, 2017, OFAC designated Fana Moj for providing support and services to the Islamic Revolutionary Guard Corps and for designing components for the Iranian military's missile systems.  On October 25, 2007, OFAC designated the Islamic Revolutionary Guard Corps because of its connection to Iran's ballistic missile and nuclear programs.  On October 13, 2017, OFAC also designated the Islamic Revolutionary Guard Corps under terrorism authorities for playing a central role in Iran becoming a state sponsor of terror.

36.    Fana Moj additionally has close commercial relationships with Iranian public and government organizations, several of which OFAC has designated.  Fana Moj's customers include the Islamic Republic of Iran Broadcasting, which OFAC designated on February 6, 2013, the Iran Communication Industries, which OFAC designated on September 17, 2008, and the Iran Electronics Industries, which OFAC designated on September 17, 2008.

C. **Wang's Illegal Exports to Iran Via Sky Rise Technology**

37.    Hong Kong business records reveal that Wang owns all issued shares of Sky Rise Technology.

38.    A confidential reliable source ("CS-2") provided documentation from March 10, 2015, which revealed that Sky Rise Technology imported 15 shipments of connectors, resistors, white metal alloy, optical components, bearing sets, and coaxial terminators from the United States.  Connectors, resistors, white metal alloy, optical components, bearing sets and coaxial terminators are used, among other things, in nuclear power projects.

39.    CS-2 additionally indicated that Sky Rise exported 24 shipments to Iran. The exported shipments included connectors, resistors, electronic components, capacitors, processors,

leak detectors and pharmaceutical products. Fana Moj is known to have sourced these and similar U.S.-origin items on behalf of the Government of Iran's military programs.

40.     Wang, using Sky Rise, re-exported these U.S.-origin products to Iran.

**D.      Wang's Illegal Exports to Iran Via 32 Group China Ltd.**

41.     As noted in the Entity listing, 32 Group China Ltd. is one of Jack Wang's front companies. CS-2 further revealed that 32 Group China Ltd. imported three shipments of electronic components, that is, flat panel displays, and Polaris passive spectra system and communication cables from the United States. CS-2 confirmed that 32 Group China Limited exported a shipment of such electronic components to Iran. Passive spectra systems and similar 3D measurement technology systems are used in a variety of defense applications, including advanced military systems. These items are known to be sought by end users in Iran.

42.     Wang, using 32 Group China Ltd., re-exported these U.S.-origin electronic components to Iran.

**E.      Wang's Illegal Scheme Totaled At Least $1,108,022.27**

43.     Wire transaction records corroborate the findings by the Department of Commerce and Department of State that Wang used his companies to conduct this illegal scheme. For example, Wang made personal payments to electronic component manufacturers on behalf of his front companies who were nominally conducting business with these manufacturers. This practice of making personal payments for multiple companies' official expenses reflects a lack of formalized corporate structure, which is consistent with the operation of front companies.

44.     From 2011 to the present, Wang and his front companies originated wire transfers from offshore U.S. dollar accounts worth more than $1,108,022.27.

45.     Of these $1,108,022.27 in transactions, at least $641,086.00 came from wires to approximately 20 companies that exported items to Wang, where Wang made the payments via

U.S. dollars.   These $641,086.00 in exports were for U.S.-origin items, for which Wang and his associated front-companies failed first to obtain the required licenses from the Department of Commerce and OFAC to re-export to Iran.

46.    The remaining approximately $533,063.73 in transactions reflect Wang conducting U.S. dollar wire transfers between overseas electronics manufacturers, distributors and telecommunications companies.   Wang and his associated front-companies conducted these approximately $533,063.73 in U.S. dollar transactions without first obtaining the required licenses from OFAC to re-export to Iran.

47.    Wang and his associated front-companies made the additional approximately $533,063.73 in payments to electronics component manufactures, including:

a.    Chinese Company 1, a manufacturer of electron beam welding machines. Electron beam welding machines are used in defense and nuclear industries;

b.    Chinese Company 2, a company that specializes in aluminum honeycomb products.   These products are used in various aerospace applications including rockets, aircraft, and jet engines; and

c.    Dutch Company 1, a company that manufactures scintillation detectors. These devices are used in radiation and particle detectors, and nuclear cameras.

48.    The total payments that are involved in this conspiracy are summarized as follows:

| U.S. Dollar Payments to Electronics Component Manufacturers | | |
|---|---|---|
| Subject | Date Range | Amount |
| 32 Group China Ltd. | November 2012 – June 2014 | $283,238.55 |
| Reekay Technology | July 2014 - February 2015 | $172,457.32 |
| Sky Rise Technology Ltd. | December 2011 - December 2015 | $204,171.03 |
| TiMi Technologies Co. Ltd. | February 2012 - March 2015 | $229,491.36 |
| Wang Wei | January 2013 - October 2015 | $218,664.01 |
| | Total: | $1,108,022.27 |

## II.      WANG'S TRANSACTION INVOLVING DEFENDANT PROPERTY 1

49.      The EB-5 visa or EB-5 immigrant investor visa program provides a method for eligible immigrant investors to become lawful permanent residents (i.e., "green card holders") by investing at least $1,000,000 to finance a business in the United States that will employ at least 10 American workers, or $500,000 to finance a business in a targeted employment area in the United States that will employ at least 10 American workers.

50.      The Cleveland International Fund is an Ohio-based regional center offering foreign nationals the opportunity to make investments in the United States for the ultimate purpose of obtaining U.S. citizenship through the EB-5 investment visa program.

51.      Wang is an investor in the Cleveland International Fund's Medical Mart Hotel project, whose members consist of the Cleveland International Fund as the managing member, as well as individual overseas members who purchase their membership unit for $500,000, pursuant to the EB-5 program.

52.      The Cleveland International Fund used the EB5 funds to finance a portion of the construction and related costs of the redevelopment of a vacated hotel property in Cleveland. Specifically, the Cleveland International Fund used the funds to purchase bonds from the Cleveland-Cuyahoga County Port Authority whose proceeds in turn funded the hotel development project.

53.      Cleveland International Fund records revealed that on or about September 2013, Wang applied for an EB5 visa, and made the requisite transfer of $545,000.00 to the Cleveland International Fund (i.e., the source of Defendant Property 1), which includes a $45,000 nonrefundable administrative fee. On or about April 2015, the investor funds were released from the Company's escrow bank ("U.S. Bank 1") and disbursed to the bond trustee ("US Bank 2").

54.      In April 2015 the funds were transferred to the borrower's bank ("U.S. Bank 3").

55.     On or about May 1, 2015, the Cleveland International Fund ultimately wired Defendant Property 1, along with other EB5 investment funds totaling $36,000,000.00, to a U.S. company engaged in the hotel's construction project in the form of a bond. The specifics of this bond are as follows:

> This Bond is one of a duly authorized issue of revenue bonds of the Authority designated First Mortgage Lease Revenue Bonds, Series 2011 (Optima 777, LLC Hotel Project) (the "Series 2011 Bonds") issued under the Amended and Restated Trust Indenture of even date herewith (the "Indenture"), between the Authority and the Trustee, and aggregating in principal amount $36,000,000. The Series 2011 Bonds are issued for the purpose of: financing costs of demolishing, rehabilitation, constructing, equipping, installing, furnishing, improving and developing real and personal property, or a combination thereof, comprising "port authority facilities" as defined in Section 4582.01, Ohio Revised Code, constituting a hotel facility (the "Project") to be owned by Issuer, through a Ground Lease, and leased to Lessee. The facilities included in the Project will be demolished, rehabilitated, constructed, equipped, installed, furnished, improved and developed pursuant to the Lease and Construction Agency Agreement dated of even date with the Indenture (the "Construction Agency Agreement") between the Authority and Lessee, as an independent contractor and agent of the Authority (together with its successors and any permitted assigns as such agent, the "Construction Agent").

Amended Restated Bond No. R-71-A, Page 3.

56.     The agreement between Wang and the Cleveland International Fund allows the Cleveland International Fund to use Wang's funds to gain a membership unit in the Cleveland International Fund - Medical Mart Hotel, Ltd., which would result in the wiring of the principal plus any accrued interest after completion of the bond. The agreement states: "The Subscriber's Capital Contribution will be held in escrow pursuant to a separate escrow agreement among the Escrow Agent, the Subscriber, and the Company until the USCIS [U.S. Citizenship and Immigration Services] i) approves the Subscriber's I-526 Petition (in which case the Company will direct the Escrow Agent to release the Capital Contribution to the Company and, upon receipt of the Capital Contribution, the Subscriber will be admitted as a Member of the Company)." Westin Subscription Agreement (with codicil), Page 2-3.

57.     On September 19, 2016, Wang notified the United States that he wished to discontinue his EB-5 application.  As described above, prior to discontinuing his application, the Department of Commerce placed Wang on the Entity list.

58.     Wang laundered $500,000.00 into the United States in support of his EB5 application, which was converted into one ownership unit in the Cleveland International Fund - Medical Mart Hotel, Ltd.  These funds have been invested in a bond which will mature in 2020, and will result in a pay out at that time to Wang.

59.     Wang illegally enriched himself by procuring approximately $641,086 worth of U.S. origin technology and exporting this technology, including to sanctioned entities in Iran during the same time frame.  As such, the Defendant Property 1 is the proceeds of violations of IEEPA the EAA, and 18 U.S.C. § 554(a), and involved in the promotion of violation of such laws.

## III.     WANG'S TRANSACTION INVOLVING DEFENDANT PROPERTY 2

60.     As noted above, the Department of Commerce and the Department of State found Reekay Technology to be a front company used by Wang to illicitly divert sensitive technology to Iran.  Moreover, as noted above, Wang made personal U.S. dollar payments on behalf of Reekay Technology to electronics component manufacturers.

61.     Reekay Technology predominantly existed to facilitate the illicit diversion of goods to Iran.

62.     On or about February 4, 2015, Chinese Front Company 1 wired $141,086.00 (the funds that constitute Defendant Property 2) to Reekay Technology.  The U.S. intermediary bank blocked Defendant Property 2 as it transited through the United States to Reekay for sanctions compliance reasons.  Defendant Property 2 remains in the U.S. intermediary bank's blocked funds account.

63.     Chinese Front Company 1 bears the hallmarks of a front company. That is, the company lacks an official website and appears to have little to no web presence.

64.     A query of government customs database revealed that Chinese Front Company 1 has no history of exporting U.S. origin goods.

65.     The address for Chinese Front Company 1 is used by more than 15 unrelated companies. On October 7, 2015, the Department of Commerce added one of the companies that used this address to the Department of Commerce Unverified List. The Unverified List contains the names and addresses of foreign persons who have been parties to a transaction of items subject to the EAR, and whose bona fides the Department of Commerce has been unable to verify through an end-use check.

66.     Iranian procurement agents often use companies whose addresses ultimately become part of the Unverified List.

67.     Wang, using Reekay Technology, conducted the blocked transaction involving Defendant Property 2 with Chinese Front Company 1 as part of the above-described illegal scheme.

## COUNT ONE -- FORFEITURE
### (18 U.S.C. § 981(A)(1)(C))

68.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 67 above as if fully set forth herein.

69.     Jack Wang, and others, known and unknown, acted individually and conspired together to conduct the above identified illegal procurements, payments, and exports, in violation of IEEPA, specifically 50 U.S.C. § 1705, 18 U.S.C. § 554(a), and the conspiracy statute, 18 U.S.C. § 371.

70.     As such, the Defendant Properties are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to a violation of IEEPA, 18 U.S.C. § 554(a), and a conspiracy to violate these statutes.

## COUNT TWO -- FORFEITURE
### (18 U.S.C. § 981(A)(1)(A))

71.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 67 above as if fully set forth herein.

72.     Jack Wang acted individually, and conspired with others known and unknown, to transmit and transfer funds to a place inside the United States from or through a place outside the United States, that is, China, and to a place outside the United States, that is, China, from or through a place inside the United States, with the intent to promote the carrying on of violations of IEEPA, 18 U.S.C. § 554(a).

73.     As such, the Defendant Properties are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A), as any property, real or personal, involved in transactions in violation of 18 U.S.C. § 1956(h) and (a)(2)(A), or as any property traceable to such property.

## COUNT THREE – MONEY LAUNDERING MONETARY PENALTIES
### (AGAINST DEFENDANT; 18 U.S.C. § 1956(b))

74.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 67 above as if fully set forth herein.

75.     Jack Wang and his related front companies transmitted and transferred at least $1,108,022.27, which promoted IEEPA and 18 U.S.C. § 554(a) violative transactions.

76.     Jack Wang acted individually, and conspired with others known and unknown, to transmit and transfer funds to a place inside the United States from or through a place outside the United States, that is, China, and to a place outside the United States, that is, China, from or through

a place inside the United States, with the intent to promote the carrying on of violations of IEEPA, 18 U.S.C. § 554(a).

77.     Jack Wang and others, known and unknown, conspired together to commit violations of 18 U.S.C. §§ 1956(a)(2)(A), in violation of 18 U.S.C. § 1956(h).

78.     Pursuant to 18 U.S.C. §§ 1956(b) and 1956(h) whoever conducts or attempts to conduct a transfer described in Section 1956(a)(2), or conspires to do the same, is liable to the United States for a civil penalty of not more than the greater of (a) the value of the property, funds, or monetary instruments involved in the transaction; or (b) $10,000.00.

79.     Accordingly, the Defendant is liable to the United States for the value of the funds and monetary instruments involved in the transactions as a civil penalty in an amount to be determined at trial.

*     *     *

**PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays as follows:

A.    that notice issue on the Defendant Properties as described above;

B.    that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

C.    that judgment be entered declaring that the Defendant Property 1 (one ownership interest in the Cleveland International Fund - Medical Mart Hotel, Ltd held in the name of Wang Wei, a/k/a Jack Wang set to mature in 2020 and pay out $500,000.00) and Defendant Property 2 ($141,086.00) be forfeited to the United States of America for disposition according to law;

D.    that a money judgment be entered in favor of the United States against Defendant in the amount of the funds and monetary instruments involved in the transactions described above as a civil penalty to be determined at trial; and

E.    that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: July 18, 2018
       Washington, D.C.

                                  Respectfully submitted,

                                  JESSIE K. LIU, D.C. Bar #472845
                                  United States Attorney

                          By:    _____/s/_____
                                  ZIA M. FARUQUI, D.C. Bar #494990
                                  BRIAN HUDAK
                                  Assistant United States Attorneys
                                  555 Fourth Street, NW
                                  Washington, DC 20530
                                  (202) 252-7566 (main line)

                                  *Attorneys for the United States of America*

## **VERIFICATION**

I, Cindy Burnham, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 18th day of July, 2018.


_____*/s/ Cindy Burnham*_____
Cindy Burnham
Special Agent
Federal Bureau of Investigation